**Opinion issued June 27, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-18-00162-CR**

**NO. 01-18-00163-CR**

————————————

**MORRIS PAUL GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case Nos. 17884 & 17885**

## MEMORANDUM OPINION

Appellant, Morris Paul Green, was found guilty by a jury of the separately-

charged offenses of aggravated robbery and evading arrest by using a vehicle.[1] The

---

[1]    *See* TEX. PENAL CODE § 29.03(a) (aggravated robbery); *id.* § 38.04(b)(2)(A)
(evading arrest).

jury found two felony enhancement allegations to be true. In accordance with the habitual offender statute, the jury assessed Appellant's punishment at life in prison for each offense.[2] Appellant appeals both judgments of conviction.[3] In five issues, Appellant contends that the evidence was insufficient to support the judgment of conviction for each offense, he received ineffective assistance of counsel, the trial court abused its discretion in limiting the defense's closing argument, and the trial court erred in denying his *Batson* challenge.[4]

We affirm both judgments of conviction.

## Background

Felder's Buy-N-Bye is a convenience store in Brenham, Texas. Tootsie's Check Cashing is located within Felder's store. On the morning of November 11, 2016, K. Kroll, an employee of both Felder's and Tootsie's, was working behind the counter as a cashier. Several regular customers were there drinking coffee and visiting as they normally did in the morning. Then, around 10 a.m., three men entered the store. Two of the men were wearing masks, and the third man was

---

[2]   *See* TEX. PENAL CODE § 12.42(d) (providing range of punishment of life or between 25 and 99 years for most felony convictions enhanced by two prior felony convictions).

[3]   Appellate cause number 01-18-00162-CR corresponds to trial court cause number 17884 (aggravated robbery) and appellate cause number 01-18-00163-CR corresponds to trial court cause number 17885 (evading arrest).

[4]   *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).

wearing sunglasses, a skull cap, gloves, a striped polo shirt, a yellow safety vest, and black sneakers with orange and white soles. One of the masked men pointed a handgun at Kroll as he entered the store. He jumped the counter, shoved Kroll against the wall, and held the gun to her head. He told Kroll that it was a robbery. The other masked man also had a handgun. He pointed it at the customers, some of whom were in their 80s, and told them to get down on the floor. The third man, wearing the yellow safety vest, slid over the counter. He grabbed a cash box from a cabinet under the counter, a brown paper bag, and a cash-register tray from inside a drawer above the cabinet.

The masked man holding Kroll swung her around and ordered her to open the cash register. Kroll complied while at the same time hitting a button activating a silent alarm. The masked man took the tray out of the cash register's drawer, and he pushed Kroll to the floor. The three men quickly left. The entire robbery lasted about 30 seconds. The robbery was captured on a security camera inside the convenience store. While she was still on the floor, Kroll looked out the front through a window crack. She observed the three robbers get into a white four-door car, parked near the store, and then saw the car leave the parking lot.

T. Kurie, a corporal with the Brenham Police Department, was in his patrol car when he heard the report of the robbery over his communications system. He immediately positioned himself in a location where he thought the getaway car

3

would be passing. Within 30 seconds, the white four-door car passed Corporal Kurie's location, and he began to follow it. Because of safety concerns, Corporal Kurie did not initiate a traffic stop of the white car until he was joined by another law enforcement officer, a state trooper, in a separate vehicle. Once the state trooper arrived, Corporal Kurie activated the overhead emergency lights of his marked patrol car. The white car took off at a high rate of speed. Corporal Kurie activated his siren and pursued the white car. Corporal Kurie later testified that "the vehicle continued driving in a reckless manner, passing vehicles on the left, on the right shoulders, multiple times." He confirmed that people in other vehicles on the road were placed in jeopardy. The chase continued from where it began in Washington County into Waller County and ended in Harris County. At least four law enforcement agencies, 12 to 15 police vehicles, and a helicopter were involved in the pursuit. The chase finally ended at a point where the road was under construction. Four men bailed out of the car while it was still in drive. The men began to run across an adjacent field.

Appellant had been in the front, passenger seat. When he jumped out, he was carrying a duffle bag. Appellant ran to a fence bordering the field, threw the bag over it, climbed the fence, and started to run across the field with the bag. Appellant dropped the bag and continued to run a short distance before laying down in the field. He was then taken into custody by police. When he was caught,

4

Appellant was wearing only one shoe. The shoe had an orange and white sole like the shoes worn by the robber at Felder's, who had slid over the counter and taken the cash box. When they opened the duffle bag that Appellant had been carrying, the police found that it contained the cash box, checks, and cash taken from Tootsie's and Felder's during the robbery. The other three occupants of the car were also caught after they ran.

The police obtained a warrant to search the car. In the front passenger side of the car, where Appellant had been sitting, the police recovered a striped polo shirt, a skull cap, gloves, and a yellow safety vest, appearing to be the same as the clothing worn by the robber who had slid over the counter to take the cash box. The police also recovered a handgun from the car and the cash register trays taken during the robbery.

Appellant was separately charged with the offenses of aggravated robbery and evading arrest by use of a vehicle. The two charged offenses were tried together to a jury.

During the guilt-innocence phase, the State offered the testimony of the store clerk, Kroll, and two store customers who were present during the robbery. Six law enforcement officers who were involved in the pursuit and apprehension of the four men in the car, including Corporal Kurie, also testified at trial.

In addition, the State offered the accomplice-witness testimony of Christopher Bazile. He had entered a plea of guilty in exchange for a 25-year prison sentence. Bazile admitted he was one of the robbers. Bazile testified that, during the robbery, he "had jumped over the counter" and "grabbed her [Kroll]" with a gun pointed at her head. Bazile identified a man named "Jevon" as the robber who had ordered the customers on the ground. He stated that Appellant was the man who had jumped the counter and taken the cash box, and he indicated that Appellant had participated in the planning of the robbery. The State also elicited testimony from Bazile that, when the men were fleeing in the white car, Appellant had asked Jevon for a gun so that he could shoot at police.

The State's evidence also included several videos. These included the security video from the store, showing the robbery, and a dash-camera video from one of the police cars, showing the pursuit of the getaway car, the four men jumping out of the car, and the foot pursuit and apprehension of Appellant and his accomplices. The State's exhibits also included still photos from the videos, photos of the contents of the duffle bag and the car, and photos of the clothing that Appellant was wearing when he was caught, including his shoe with its distinctive orange and white sole. In addition, the clothing items recovered from the front passenger side of the car were admitted into evidence.

The charge permitted the jury to find Appellant guilty of both offenses as either the principal actor or as a party. The jury found Appellant guilty of both charged offenses: aggravated robbery and evading arrest with a vehicle. During the punishment phase, the jury determined that Appellant had two prior felony convictions and assessed Appellant's punishment at life in prison for each offense. Appellant now challenges both judgments of conviction, raising five issues.

## Sufficiency of the Evidence

In his first and third issues, Appellant challenges the sufficiency of the evidence to support the two judgments of conviction.

### A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at

319; *In re Winship*, 397 U.S. 358, 361 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the Jackson standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative

force of all the incriminating circumstances is sufficient to support the conviction."

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.     Aggravated Robbery**

In his third issue, Appellant contends that the evidence was "insufficient to sustain the jury's verdict because the State failed to prove beyond a reasonable doubt that he participated, either as a principal or a party, in the aggravated robbery as the only evidence tending to connect him to the offense was the uncorroborated testimony of [Bazile]." Bazile admitted that he was the robber who held Kroll at gunpoint and forced her to open the cash register. Bazile testified that Appellant was the robber who slid over the counter and grabbed the cash box. The State responds that evidence, aside from Bazile's testimony, was presented connecting Appellant to the offense. We agree with the State.

Regarding accomplice-witness testimony, the Texas Code of Criminal Procedure provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. art. 38.14.

When reviewing the sufficiency of the corroborating evidence, we exclude the accomplice testimony from our consideration and determine whether there is any independent evidence that tends to connect the defendant with the commission

of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Hernandez v. State*, 454 S.W.3d 643, 647 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). We view the corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). If there are two views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.* It is not necessary that corroborating evidence directly connect a defendant to an offense or be sufficient by itself to establish guilt. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. (Tex. Crim. App. 1999). The corroborating evidence may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442. The evidence must simply link the accused in some way to the commission of the offense and show that rational jurors could conclude that the evidence sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

To establish that he committed the offense of aggravated robbery, the State was required to prove that Appellant, while in the course of committing theft of property owned by K. Kroll, and with intent to obtain and maintain control of the property, intentionally and knowingly threatened and placed Kroll in fear of imminent bodily injury and death while using and exhibiting a deadly weapon,

namely, a handgun. *See* TEX. PENAL CODE § 29.03(a)(2); *see also id.* § 31.03 (setting out elements of theft). The trial court's charge permitted Appellant to be found guilty as either the principal actor or as a party to the offense.

The charge instructed the jury that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

Here, parties agree that Bazile was an accomplice. Therefore, we must disregard Bazile's testimony in our analysis and determine whether other evidence tends to connect Appellant to the offense of aggravated robbery.

Appellant contends that there is no evidence tending to connect him to the aggravated-robbery offense. To support his position, Appellant points out that neither Kroll nor the customers in the convenience store could identify Appellant as one of the robbers. And he points out that none of the clothing items recovered from the getaway car, such as a yellow safety vest, skull cap, gloves, and striped polo shirt—matching clothing worn by the robber who took the cash box—were tested for DNA evidence. Appellant also anticipates that "[t]he State will surely

11

argue that appellant was arrested after exiting a vehicle that was allegedly connected to the crime. Without the accomplice witness testimony, there is no evidence as to how appellant got into that vehicle or if he participated in any capacity."

The State asserts that there is evidence tending to connect Appellant to the aggravated robbery, and there is sufficient evidence to support his conviction. We agree with the State.

The convenience store's security video, and still photos from the video, show the man who slid over the counter and grabbed the cash box while the two other robbers held Kroll and the customers at gunpoint. That man had black tennis shoes with distinctive orange and white soles. When he was taken into custody in the field following the car chase, Appellant was wearing one tennis shoe. The evidence included photos of Appellant lying on the ground in the field wearing the shoe and photos of the inventoried items Appellant was wearing when arrested, which include the shoe. The shoe has a distinctive pattern and coloration that appears to be the same as the shoes worn by the man who jumped the counter at the convenience store and took the cash box. The man in the security video was wearing sunglasses and a skull cap, but unlike the two other robbers, he was not wearing a mask. Other than his eyes, Appellant's facial features as well as his skin tone, body shape, and size can be seen in the video. The jury was free to compare

12

these images to Appellant's appearance at trial and in the photos from when he was captured and conclude that he was the robber who jumped the counter. *See Johnson v. State*, 354 S.W.3d 491, 494 (Tex. App.—San Antonio 2011, pet. ref'd) (determining surveillance photographs sufficient independent evidence tending to connect defendant to robbery); *see also Simmons v. State*, 282 S.W.3d 504, 509 (Tex. Crim. App. 2009) (stating issue "is not how an appellate court would independently assess the non-accomplice evidence but whether a rational [jury] could conclude that the non-accomplice evidence 'tends to connect' [the] appellant to the offense").

In addition, the evidence shows Kroll saw the robbers get into a white four-door car and leave the convenience store parking lot. Corporal Kurie heard a dispatch about the robbery and positioned his patrol car so that he could follow the white car when it passed. He testified it took only 10 seconds to position his car, and then he saw the white four-door car less than 30 seconds later. He began to follow the car. From that point on, police were following the car until the pursuit ended. Thus, the evidence shows that Appellant was in the car from at least the time Corporal Kurie first saw the car, which was shortly after the robbery. *See Smith*, 332 S.W.3d at 443 ("[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious

13

circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." (internal quotations omitted)).

When the pursuit ended, Appellant jumped out of the car and began to flee on foot from the police. One of the police officers involved in the capture of Appellant testified that, when the car chase ended, he saw Appellant jump out of the vehicle carrying a duffle bag. Appellant carried the bag as he fled on foot from police. He ran to a fence surrounding a field, threw the bag over the fence, climbed the fence, and began to run through the field with the bag. Appellant dropped the bag and ran before lying down in the field. He was then taken into custody by police. The evidence showed that the duffle bag carried by Appellant as he ran from police contained checks and cash taken from Tootsie's and Felder's, the businesses that were robbed. The bag also contained the metal cash box taken during the robbery by the man in the video wearing shoes like the shoe Appellant was wearing when he was captured. *See Keith v. State*, 384 S.W.3d 452, 458 (Tex. App.—Eastland 2012, pet. ref'd) ("A defendant's unexplained possession of property recently stolen permits an inference that the defendant is the one who committed the theft.").

Items recovered from the car were linked to the robbery. The drawers from the convenience store's cash register, a handgun, and items of clothing that appear to be the same as those worn by the robber who slid over the counter were found in

the car in which Appellant had been riding since immediately after the robbery. *See Washington v. State*, 449 S.W.3d 555, 571–72 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing fleeing from police and being in vehicle with items linked to offense as evidence tending to connect defendant with offense).

Eliminating the accomplice testimony from consideration, we conclude that the combined weight of the non-accomplice evidence, viewed in the light most favorable to the jury's verdict, sufficiently tends to connect Appellant to the offense of aggravated robbery as charged. *See Simmons*, 282 S.W.3d at 508; *Malone*, 253 S.W.3d at 257. And, viewing the evidence—including Bazile's testimony and the other circumstantial evidence connecting Appellant to the offense—in the light most favorable to the verdict, we conclude a rational fact finder could have found beyond a reasonable doubt each element necessary to support the finding that Appellant committed the offense of aggravated robbery as a party to the offense. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction for the offense of aggravated robbery.

We overrule Appellant's third issue.

## C. Evading Arrest by Using a Vehicle

In his first issue, Appellant contends that the evidence was insufficient to support his conviction "for evading arrest with a vehicle." A person commits an offense "if he intentionally flees from a person he knows is a peace officer or

15

federal special investigator attempting lawfully to arrest or detain him" and "uses a vehicle while [he] is in flight." *See* TEX. PENAL CODE § 38.04(a), (b)(2)(A).

Appellant argues that the evidence was not sufficient to prove that he "used" a vehicle to flee from the police because the evidence showed that he was not the driver of the getaway car but was instead a front-seat passenger. Appellant asserts that "driving (or operation of the vehicle) is the gravamen of the offense of evading arrest while using a vehicle." In short, Appellant claims that only a vehicle's driver or operator can be found guilty of evading arrest while using a vehicle. Irrespective of the merit (or lack of merit) of this claim, Appellant's argument presumes that the jury found him guilty as the principal actor of evading arrest with a vehicle. However, the charge permitted the jury to find Appellant guilty of evading arrest with a vehicle as either a principal actor or as a party to the offense. When a court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

As with the aggravated-robbery charge, the trial court instructed the jury that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a). A person is "criminally responsible" for an offense committed by the conduct of another if,

16

acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

In determining whether a person acted as a party, the fact finder may consider events occurring before, during, and after the commission of the offense and may rely on the person's actions showing an understanding and a common design to commit the prohibited act. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994). Evidence is sufficient to convict under the law of parties if the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Id.* Participation as a party in a criminal offense may be inferred from circumstances and need not be shown by direct evidence. *Trenor v. State*, 333 S.W.3d 799, 807 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Here, to determine whether Appellant is criminally liable as a party to the offense, we consider the events occurring before, during, and after Appellant and his accomplices fled from police and Appellant's actions showing an understanding and a common design to flee from police in the getaway car. The evidence showed that, during the convenience store robbery, Appellant slid over the counter, took the cash box while Bazile held Kroll at gunpoint and forced her to open the cash register. A third man, Jevon, held the customers at gunpoint and

17

made them lie on the floor. The robbers ran from the store to a white car waiting in the parking lot that was driven by a fourth man and then took off. Corporal Kurie followed the robbers and, once joined by another officer, initiated a traffic stop by activating his lights. The white car sped away at a high rate of speed, driving recklessly through traffic. The police pursuit began in Washington County, continued through Waller County, and ended in Harris County. The evidence showed that, while they were fleeing in the car, Appellant asked Jevon for a gun so that he (Appellant) could shoot at police. At the end of car pursuit, Appellant grabbed the bag containing the cash and checks taken during the robbery. The robbers bailed out of the car while it was still in drive, and Appellant and the other three men ran from police through a field but were apprehended.

From the evidence, the jury could have reasonably found that Appellant's words and actions showed an understanding and common design to commit the offense of evading arrest while using a vehicle. *See Ransom*, 920 S.W.2d at 302. And the jury could have reasonably found that Appellant, with intent to promote or assist the commission of the offense, encouraged and attempted to aid the driver of the getaway car in the flight from police. *See* TEX. PENAL CODE § 7.02(a)(2).

Viewing the evidence in the light most favorable to the verdict, we conclude a rational fact finder could have found beyond a reasonable doubt each element necessary to support the finding that Appellant committed the offense of evading

18

arrest with a vehicle as a party to the offense. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction.

We overrule Appellant's first issue.

**Ineffective Assistance of Counsel**

In his second issue, Appellant argues that he received ineffective assistance of counsel because his trial attorney did not request a jury instruction for simple evading arrest on foot as a lesser-included offense of evading arrest with a vehicle.

**A.     Governing Legal Principles**

We evaluate ineffective assistance claims under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, an appellant must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms, and (2) but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 687–88. An appellant must prove deficient performance and sufficient prejudice by a preponderance of the evidence. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

In reviewing ineffective-assistance claims, we begin with a strong presumption that counsel's behavior fell within the range of reasonable professional conduct. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App.

19

1994). "[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (internal quotations omitted). To overcome this presumption, "allegation[s] of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

When the record is silent regarding counsel's strategy, we will not find deficient performance unless the challenged conduct is "so outrageous that no competent attorney would have engaged in it." *Garcia*, 57 S.W.3d at 440. Consequently, the record on direct appeal will ordinarily not give reviewing courts enough information to evaluate the merits of an ineffectiveness claim. *See Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

## B.    Analysis

Assuming without deciding that a lesser-included offense instruction would have been permissible, the record does not reflect why trial counsel did not request a lesser-included offense instruction of simple evading arrest. Trial counsel may have chosen not to request the lesser-included offense because he believed that the jury would acquit Appellant of the charged offense of evading arrest with a motor vehicle. "[I]t is a reasonable trial strategy to decide to not request a charge on a

lesser included offense." *Davis v. State*, 930 S.W.2d 765, 768 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd); *see Ex parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) (holding counsel not ineffective for failure to request lesser-included offense because all-or-nothing approach was strategy decision). Because the decision not to request the lesser-included offense instruction may have been strategic, and the record is silent regarding counsel's reasons, Appellant has not shown deficient performance. *See Washington v. State*, 417 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (determining that, because record contained no explanation for trial counsel's failure to request lesser-included offense instruction, "[t]he decision to not request a lesser included could have been strategic; thus, appellant has failed to show deficient performance").

We overrule Appellant's second issue.

### *Batson* Challenge

In his fifth issue, Appellant contends that the trial court erred when it denied his *Batson* challenge after the State used peremptory challenges to strike two African-American prospective jurors.

### A. *Batson* Challenge in Trial Court

At the end of voir dire, the State used two of its peremptory challenges to strike two African-American prospective jurors from the venire panel (Prospective Jurors 32 and 37). Appellant then raised a *Batson* challenge to the strikes.

The following discussion occurred regarding the challenge:

[Defense Counsel]: Yes, Your Honor. I would just like to, for the record, note that the race of the defendant is an African-American male and that there were two African-Americans within the strike zone for the jury, one African-American within the strike zone for an alternate. Both African-Americans for the jury were struck by the State. No African-Americans were struck by the defense. There is an African-American as an alternate but, of course, she is not on the jury. She's allowed to sit through the jury, but she's not allowed to be a part of deliberations unless one of the jury members is excused for some reason; and so I think that at this point, it's incumbent upon the State—the burden's upon the State to provide race neutral reasons for the strike of Juror Number 32, who was an African-American male, and Juror Number 37, who was an African-American male. Juror Number 42 is the alternate who has been seated as an alternate but is not a juror.

. . . .

[The State]: First of all, I was not even aware that Juror 37 was an African-American in going through our list. Regardless, with regard to 32, there was a number of questions that were asked that he gave responses that I do not believe were favorable for the State and so we struck him. The first was on a question of whether local law enforcement is worthy of respect, it was a 1 to 5 scale with 5 being the strongly agree, 4 being agreed, 3 being neutral, 2 being disagree, and 1 being strongly disagree and he said 3, which is neutral; and out of the entire panel, he is the only—he gave the lowest response to that. He is the only person that gave a 3 in response to law enforcement officers in our local community being worthy of respect.

The second question that we found that he was negative to the State was the question on whether or not a person's previous criminal history—person's past criminal behavior should be taken into consideration in current punishment. Again, this was a 5 to 1 scale with strongly agree, agree, neutral, disagree, or strongly disagree. He gave the answer of

22

neutral on whether a person's past criminal behavior should be taken into consideration in current punishment. It is the position of the State the defendant has a very lengthy criminal history and we think that this case is going to come down to punishment and we want jurors who are going to take his past criminal history into account. That's why we felt that [Juror 32] was not a good candidate for this particular jury. . . .

THE COURT: Let me take up [Juror 32] first. Is there any response from the defense?

[The Defense]: No, Your Honor, and I noted those same—those same responses and I think it's Number 37 who I'm more looking at because I figured he was going to say those were the answers but–

[The State]: Sure.

[The Defense]: —for the record, I needed to make the record.

[The State]: Okay.

THE COURT: Okay. The Court does find in regard to Juror Number 32, [E.] Ragston, that the State did have race neutral reasons for striking the juror. Therefore, the *Batson* challenge as to Juror Number 32 is denied. We'll move now to Juror Number 37, [N.] Evans.

[The State]: Thank you, Your Honor. In regard to Mr. Evans, the first answer on whether or not local law enforcement was worthy of respect, he gave a 4, which was about average. Some people gave 5s. Some people gave 4s. He gave a 4 but then on the question of whether or not a person's past criminal behavior should be taken in consideration in current punishment, he gave a 3, a 3 being neutral; and again, Mr. Green's criminal history is very lengthy and we expect that this case really is a case about punishment and since he only was neutral with regards to a person's past criminal behavior being taken into consideration for current punishment, we struck him. Additionally, we struck Jurors Number 12, who was a, for the record, white female, church secretary, Ms. Putnam. She had a 5 on respect for law

23

enforcement, but she only gave a 3 with regard to past criminal behavior; and we struck her because of the 3 she gave on the past criminal behavior. Additionally, with regard to Juror Number 18, again, she gave a 3. Ms. Cardenas, she gave a 3 on past criminal behavior being taken into consideration and we struck her. I believe she was a Hispanic female and, yeah, Mr. Evans was the other individual that gave a 3 with regard to the past criminal behavior being taken into consideration for current punishment. Those are the only jurors who gave those answers. Every juror that gave a 3 on that answer, we struck.

THE COURT: Any response from the defense?

[The Defense]: Only that on the local law enforcement worthy of respect, there were 13 people who also gave a 4 out of 32 total, so I would—so I think it would require something more.

THE COURT: Anything else?

[The State]: Nothing further, Your Honor.

THE COURT: Court does find that the State had race neutral reasons for striking Juror Number 37, [N.] Evans. Therefore, the defense's objection on *Batson* challenges is denied.

Anything else, Mr. Richardson?

[Defense Counsel]: No, Your Honor.

## C.    Applicable Legal Principles

In *Batson v. Kentucky*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a prosecutor from exercising peremptory challenges based solely on the race of potential jurors. 476 U.S. 79, 89 (1986); *see also Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012). Even a single impermissible strike for a racially

24

motivated reason invalidates the jury-selection process and requires a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Finley v. State*, 529 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

A *Batson* challenge is a three-step process. *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995); *Nieto*, 365 S.W.3d at 675. First, the defendant must make a prima facie showing of racial discrimination in the State's use of a peremptory strike. *Purkett*, 514 U.S. at 767; *Nieto*, 365 S.W.3d at 676. Second, once the defendant makes the requisite showing, the State must articulate a race-neutral explanation for the strike. *Nieto*, 365 S.W.3d at 675. The race-neutral explanation is a burden of production only and does not have to be "persuasive, or even plausible." *Purkett*, 514 U.S. at 767–68. The issue is the facial validity of the explanation; unless a discriminatory intent is inherent, the explanation will be deemed race neutral. *Id.* Third, the trial court must determine if the defendant has proven purposeful discrimination by a preponderance of the evidence. *Blackman v. State*, 414 S.W.3d 757, 764-65 (Tex. Crim. App. 2013); *Nieto*, 365 S.W.3d at 676. The burden of persuasion always remains on the defendant, who can rebut the State's explanations before the trial court rules on the defendant's objection. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001); *see also Purkett*, 514 U.S. at 768 ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike.").

25

**D. Analysis**

We start by recognizing that, if the State offered a race-neutral explanation for its strikes to the trial court, the first step of the analysis, regarding whether Appellant made a prima facia case of discrimination, is moot. *See Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003); *Moore v. State*, 265 S.W.3d 73, 78 (Tex. App.—Houston [1st Dist.] 2008, pet. dism'd). Thus, we turn to the second step in the *Batson* analysis, determining whether the State proffered race-neutral explanations for striking Prospective Jurors 32 and 37.

A race-neutral explanation is one based on something other than the race of the venire member. *Hernandez v. New York*, 500 U.S. 352, 360 (1991). At this step of the inquiry, the issue is simply the facial validity of the prosecutor's explanation. *Id.* Unless discriminatory intent is inherent in the explanation, the offered reason is race neutral. *Id.*

As shown above, the State asked prospective jurors to rate from one to five whether they agreed or disagreed with certain statements. The rating scale ranged from (1) strongly agree, (2) agree, (3) neutral, (4) disagree, to (5) strongly disagree. The State explained that, when it asked Prospective Juror 32 whether local law enforcement is worthy of respect, he had responded "3," meaning he had a neutral view of that statement. The State said that this was the lowest response to that

question given by any venire member and that Prospective Juror 32 was the only venire member to give that response.

The State explained that it also struck Prospective Juror 32 because, in response to its question whether a person's past criminal behavior should be considered in assessing punishment, the prospective juror answered "three," meaning neutral. The State explained, "It is the position of the State the defendant has a very lengthy criminal history and we think that this case is going to come down to punishment and we want jurors who are going to take his past criminal history into account."

The State acknowledged that Prospective Juror 37 had answered "4," which means he agreed, when asked whether local law enforcement deserves respect. The State said that "some people gave 5s" and "[s]ome people gave 4s." The State then indicated that the reason it struck Prospective Juror 37 was because "on the question of whether or not a person's past criminal behavior should be taken in consideration in current punishment, he gave a 3, a 3 being neutral." The State continued, "[Appellant's] criminal history is very lengthy, and we expect that this case really is a case about punishment and since he only was neutral with regards to a person's past criminal behavior being taken into consideration for current punishment, we struck him."

The State pointed out that it had struck "[e]very juror that gave a 3 on that answer." The State said that the prospective jurors it struck for answering "3" included a white female who was employed as a church secretary and had answered "strongly agree" when asked whether she thought local law enforcement deserved respect and another female prospective juror who the State believed to be Hispanic.

Prospective Juror 32's response of "neutral" to the questions regarding respect for local law enforcement and consideration of past criminal behavior in assessing punishment and Prospective Juror 37's response of "neutral" to the question regarding past criminal behavior, in the context of the State's explanation that Appellant had an extensive criminal history, constitute race-neutral reasons for the preemptory strikes. *See Jones v. State*, 431 S.W.3d 149, 155 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (concluding that State's explanation that use of peremptory strikes was based on ratings that venire members returned for their local law enforcement was facially race neutral). We turn to the third step.

In the third step, we must determine whether the defendant proved purposeful discrimination; that is, whether the trial court clearly erred in failing to find purposeful discrimination in the State's use of peremptory strikes. *See Stewart v. State*, 176 S.W.3d 856, 858–59 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The trial judge must evaluate the facially race-neutral reasons given by the

prosecutor to determine whether those explanations are genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989).

When the trial court asked defense counsel if he had a response to the State's given reasons for striking for Prospective Juror 32, counsel said, "No, Your Honor, and I noted those same—those same responses and I think it's [Prospective Juror] Number 37 who I'm more looking at because I figured [the State] was going to say those were the answers" it was relying on to strike Prospective Juror 32. Regarding Prospective Juror No. 37, the defense pointed out that 13 other prospective jurors had also answered "4," meaning they agreed, when asked if local law enforcement was worthy of respect. The defense was intimating that those prospective jurors had not been struck for that response. However, the defense did not address the reason identified by State for striking Prospective Juror 37, which was his answer of "neutral" to the question of whether he could consider past crimes in assessing current punishment.

Courts have held that a number of factors, if present, tend to show purposeful discrimination. *See, e.g. Miller–El v. Dretke*, 545 U.S. 231, 264–65 (2005). (considering combined impact of number of factors in concluding that prosecutors struck prospective jurors on racially discriminatory basis); *see also Whitsey*, 796 S.W.2d at 713–14 (setting forth "nonexclusive list of factors which

weigh against the legitimacy of a race-neutral explanation"). In *Miller–El*, the Supreme Court identified the following factors: (1) that the State had struck a higher percentage of African Americans than non-African Americans, (2) that the State's reasons for striking African-American jurors appeared to apply equally to non-African-American jurors whom the State did not strike, (3) that the State had used jury shuffles in a manner that supported an inference of racial discrimination, (4) that the State had questioned African-American and non-African–American jurors differently and in a way designed to obtain answers justifying strikes of African-American jurors, and (5) that the county in which the defendant was prosecuted had a formal policy of excluding minority jurors from service. 545 U.S. at 240–64.

Here, Appellant intimates that the State's explanation was not genuine and therefore a pretext for discrimination because the State used two of its 10 preemptory strikes to strike the only two African-American prospective jurors in the first strike zone of 41 prospective jurors. In other words, the State used 20% of its strikes to strike less than 5% of the venire panel. Thus, the State used a statistically disproportionate number of strikes on African-American prospective jurors. *See Watkins v. State*, 245 S.W.3d 444, 451 (Tex. Crim. App. 2008) (noting that use of 55% of peremptory strikes to exclude 88% of black venire members was clearly disproportionate).

The disproportionality in the use of strikes may "support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham." *Watkins*, 245 S.W.3d at 452. But, as the Supreme Court in *Miller–El* noted, a comparative analysis is "[m]ore powerful" than "bare statistics," and thus we consider the State's proffered reason for striking Prospective Jurors 32 and 37. *See* 545 U.S. at 241.

The State's reasons for striking Prospective Juror 32 were his answers of "neutral" when asked whether he respected local law enforcement and whether he could consider past crimes in assessing current punishment. The State pointed out that Prospective Juror 32 was the only venire member to answer "neutral" when asked whether local law enforcement deserved respect. The other 40 venire members answered "agree" or "strongly agree." The State's explanation for striking Prospective Juror 32, based on a numerical rating system in which the prospective jurors chose the number, has support in the record and does not provide evidence of a discriminatory intent. *See Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002) (determining that prospective juror's comments about her view of police entitled State to believe her presence on jury would be adverse to its interests). Moreover, the State's reasons for striking Prospective Juror 32 went unchallenged during the *Batson* hearing. Instead, defense counsel acknowledged that he had also made notations of the responses cited by the State

for striking Prospective Juror 32. *See id.* ("[A] party's failure to offer any real rebuttal to a proffered race neutral explanation can be fatal to his claim.").

The State's reason for striking Prospective Juror 37 was his answer of "neutral" to the question whether he could consider past crimes in assessing punishment. The State pointed out that all prospective jurors who responded "neutral" to this question were stricken by the State. This is not a case in which the State's reasons for striking African-American jurors were not equally applied to strike non-African-American jurors. To the contrary, white and Hispanic prospective jurors were also stricken by the State for answering "neutral." Thus, the defense did not cross-examine the State about the strike or offer any rebuttal or impeachment evidence tending to show that the State's reason was pretextual. We conclude that the trial court could have reasonably found that the State did not have a discriminatory intent when it struck Prospective Jurors 32 and 37 but rather struck them for the reasons it gave at the *Batson* hearing.

The remaining *Miller-El* factors support the trial court's ruling. The State did not utilize a jury shuffle, and there is no evidence in the record that Washington County has a formal policy of excluding minority jurors from service. In fact, one African-American veniremember was seated as an alternate juror. Moreover, Appellant does not assert that African-American venire members were singled out for specific questioning to create a pretext to strike them. To the

32

contrary, all prospective jurors were asked the same questions by the State in utilizing its numeric rating system.

We conclude that Appellant has not met his burden to establish purposeful discrimination. *See Jasper v. State*, 61 S.W.3d 413, 421–22 (Tex. Crim. App. 2001); *Stewart*, 176 S.W.3d at 858–59. We hold that the trial court did not clearly err in denying Appellant's *Batson* challenge.

We overrule Appellant's fifth issue.

## Limiting Jury Argument

In his fourth issue, Appellant contends that "[t]he trial court abused its discretion in limiting proper defense argument thereby denying [him] the effective assistance of counsel" during the punishment phase of trial.

### A.     Standard of Review

A trial court's limitation of a defendant's closing argument is reviewed for an abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010). The trial court has broad discretion in controlling the scope of closing argument, but it may not prevent defense counsel from making a point essential to the defense. *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). A defendant has the right to argue any theory supported by the evidence and may make all inferences from the evidence that are legal, fair, and

legitimate. *Id.* Prohibiting counsel from making a particular jury argument when counsel is entitled to do so is a denial of a defendant's right to counsel. *Id.*

**B.     Analysis**

During the guilt-innocence phase of trial, the jury learned that Appellant's accomplice, Bazile, had received a 25-year sentence as part of his plea deal with the State. After the close of evidence in the punishment phase, the trial court heard argument to determine whether Appellant should be permitted to argue to the jury that, because Bazile received a 25-year sentence, Appellant should also be sentenced to 25 years. Defense counsel framed his request to make the argument as follows:

> I'm asking to specifically talk about evidence that was introduced at this trial through Christopher Bazile and through Ms. [K.] Kroll.
>
> What I would ask the Court that I be allowed to argue is that Christopher Bazile was—had egregious conduct as testified to by [K.] Kroll, that his conduct was that he jumped the counter with a pistol in his hand, that he stuck that pistol to her head, that he pushed her face against the cigarettes on the shelf, that he then grabbed her and pulled her to the ground, and that he was sentenced as part of his agreement to 25 years and that if he was sentenced to 25 years, then the man who merely jumped the counter without a weapon should be sentenced to around the same amount of time, 25 years.
>
> If the Court—if the Court didn't want me to make that—that clear comparison, then I would simply say—say everything I said before up until the point that Christopher Bazile was sentenced to 25 years. I recommend that [Appellant] also be sentenced to 25 years. Those are the two propositions that I'm making to the Court . . . .

34

The State opposed Appellant referring to Bazile's sentence as a basis for assessing Appellant's sentence. The State asserted that Appellant's proposed argument would not be proper because it involved incomplete evidence and evidence outside the record. The prosecutor pointed out that the jury had not heard evidence regarding how Bazile's 25-year sentence was reached and why the State had agreed to it. The prosecutor argued as follows:

> [E]verything that went into factoring what was appropriate for Mr. Bazile's punishment is not before this Court or before the jury. They do not have any evidence of his prior criminal history. They do not have evidence of his cooperation not only in this case but in other cases and his agreements to testify. They do not have any of the information before the Court with regard to Mr. Bazile.

> So what I'm saying is it's improper to bring in arguments related to the merits of Mr. Bazile's case because Mr. Bazile's case and all the information behind it, the evidence, is not before this jury, only a small—you know, if there was 50 slides of information relating to his punishment, they've seen one or two because that's not the point of this hearing; and so it would be saying—taking a small—a small sliver of the information where we have about the reason he received his punishment and then making arguments as if that was the totality. It creates a completely wrong impression because it's going to create the impression by Mr. Richardson to the jury that, "Oh, yeah, he did all these horrible things and, you know, all he did is get up and testify against my guy and that's why he got this offer," and that's not true.

> It's also because they have a vastly different criminal history. Mr. Bazile only has two non-violent charges compared to [Appellant's] multiple different robberies. It also doesn't present the fact that that he provided information regarding another unindicted codefendant that planned it and is currently in federal custody for a bank robbery and that information has been tied back to HPD. I mean, he gave up a lot more than just this case, all of which is not before this

35

jury; and so if he opens the argument of, "Oh, well, you know, Bazile got 25 so so should he," well, then I should be—open the door for me to say, "Oh, yeah, but this is what you don't know. Here's all the different reasons why Bazile got what he got," which would require me to then, I think, commit error by arguing outside the record. So it's better just not to open the door . . . .

The trial court ruled in the State's favor to limit Appellant's closing argument. The court prohibited Appellant from arguing either that his sentence should not be greater than Bazile's sentence because Bazile's actions during the robbery were more egregious than his or from recommending Appellant's sentence be the same as Bazile's sentence.

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019) (internal quotation marks omitted). "It should not arouse the passion or prejudice of the jury by matters not properly before them. *Id.*

Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). "[R]eliance upon these four areas of permissible argument was born out of the prohibition against introducing matters in argument that were not presented as evidence." *Milton*, 572 S.W.3d at 239.

On appeal, Appellant asserts that the trial court abused its discretion in limiting his closing statement because his proposed argument was a proper summation of the evidence. We disagree.

Appellant's proposed argument implied that Bazile's sentence was based solely on his conduct during the robbery and on his agreement to testify against Appellant. However, the prosecutor stated on the record that was not true. He informed the trial court that Bazile's sentence was also based on his cooperation with law enforcement in unrelated criminal matters and on his own criminal history, which was shorter and less violent than that of Appellant. Appellant's reliance on Bazile's sentence would have implicitly involved evidence that was not admitted at trial.

Permitting the argument would not have facilitated the jury in properly analyzing the evidence presented at trial to arrive at a just and reasonable conclusion based on the evidence alone. *See id.* Instead, it would have provided a false basis for the jury to analyze the evidence in assessing Appellant's sentence. *See id.* Thus, Appellant's proposed argument was not a proper summation of the evidence. We hold that the trial court did not abuse its discretion in limiting Appellant's argument.

We overrule Appellant's fourth issue.

## Conclusion

We affirm the judgment of conviction in each appeal.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).